**In the Matter of ODOM ENTERPRISES, INC., Debtor.**

**Bankruptcy No. LR 81–295.**

United States Bankruptcy Court,
E. D. Arkansas, W. D.

Aug. 9, 1982.

Robert J. Brown, Little Rock, Ark., for debtor.

## ORDER ABSTAINING FROM AND ACCORDINGLY DISMISSING CHAPTER 11 PROCEEDINGS WITH PREJUDICE

DENNIS J. STEWART, Bankruptcy Judge.

These chapter 11 reorganization proceedings were commenced by the debtor well over a year ago with the filing of a petition on March 13, 1981. Despite the requirement of Rule 108 of the Rules of Bankruptcy Procedure that schedules of debts and assets and a statement of affairs be filed with the petition, neither document was filed with the debtor's petition. Rather, without requesting or receiving any enlargement of time in which to file the schedule and statement out of time, the debtor filed its schedule and statement on March 24, 1981.

It was indicated in these documents that, if liquidation should ensue forthwith, all the creditors would be paid 100% of the respective indebtednesses which were owed to them, for the total value of the existing assets of the debtor was scheduled at $4,491,679.98 and the total value of the scheduled debts was stated to be $1,341,068.07. The statement of affairs further indicated that an action previously brought against the debtor by a secured creditor, *First National Bank of Little Rock v. Odom Enterprises, Inc.,* Case No. E–80–20, in the Newton County Chancery Court, had been interrupted and stayed by the filing of the chapter 11 proceeding. If the case were to appear to have a purpose other than that of simply frustrating and impairing the rights of some or all of the creditors, see *In re Buffington,* 676 F.2d 703 (8th Cir. 1981), it was incumbent upon the debtor to make timely disclosure, particularly of any income from which outstanding debts might be satisfied so as to obviate the necessity for the liquidation which had been forestalled by the filing of these proceedings.

But, despite the continuous efforts of the court to command the filing of monthly operating statements, detailing actual monthly income and expenses, as required by Rule 11–30 of the Rules of Bankruptcy Procedure, the debtor failed and refused to file any timely or meaningful monthly operating reports. On May 4, 1981, the clerk reminded the debtor to file the report "for the past month" and that "(t)his should be done monthly" under "Rules 11–30 and 218." Still, no operating statement was filed. Again, on July 7, 1981, the court notified the debtor in writing to "(p)lease file a financial report." When no operating reports were yet filed, the clerk sent out other written notices on October 23, 1981, December 28, 1981, February 26, 1982, and April 29, 1982. Still, the debtor continued, at a time which now exceeded a year since the filing of the petition, to ignore its duty to file the monthly operating statements and to make thereby a sufficient disclosure of its purposes and intention in these chapter 11 proceedings.

The other possible vehicle through which sufficient disclosure might have been made was the disclosure statement required by section 1125 of the Bankruptcy Code. Although a plan may not be circulated and votes on it solicited until a disclosure statement is filed, the debtor failed and refused to file any document purporting to be a disclosure statement for over a year after the commencement of the proceedings.

This was so even though the Code itself grants the debtor but 180 days following commencement of the proceedings in which to achieve confirmation of a plan (see section 1121(c)(3) of the Bankruptcy Code) and the court, on March 26, 1981, entered its order directing the filing of a disclosure statement and plan on or before July 11, 1981.

Prior to that date, on June 26, 1981, the debtor filed a form of a plan of reorganization containing only the most general of provisions in respect to the treatment of creditors' claims and only disclosing that it was intended to locate a buyer for the debtor's real estate who would be "specifically required to expend $1,200,000.00 in improvements on the lands being released in the contract of sale from the mortgage liens not later than September 30 of 1982, to be used in its time-sharing sales program." Then, the proceeds of the sales of time-shares were to be used to cover outstanding mortgages, the term of which was extended. The greater part of the unsecured creditors was to be paid by the issuance of "6% cumulative, preferred stock to the claimant in an amount equal to the net amount of the claim after all setoffs and adjustments in an amount equal to the fair, present, equivalent value of the claim." To that plan was appended a proposal to sell the real estate of the debtor, which had been represented to have a value of $4,000,- 000.00 in the schedules, for a purchase price of $1,000,000.00.

Thus, the plan proposed further to postpone, impair and frustrate the rights of creditors, even though the schedules of debts and assets, as noted above, showed that immediate liquidation would result in 100% payment of all creditors, unsecured as well as secured. These proposals could not conceivably constitute a confirmable plan unless sufficient income were available to permit the debtor to pay up all arrearages and maintain current payments according to its contracts with its creditors. But, as noted above, even though the court directed the filing of a disclosure statement on or before July 11, 1981, the debtor did not file a disclosure statement on that date. Rather, it sought from the court and was granted an extension of time to and including July 31, 1981, for this purpose. Another extension of time was granted on August 4, 1981, to and including August 31, 1981. On the last date, a "first modified plan of reorganization" was filed, under the terms of which fewer requirements were to be imposed upon the purchaser of the property, but fewer dilutions of the rights of the secured creditors were provided. Unsecured creditors, however, were to be paid over a period of five years, or, "*at the election of the debtor,* each holder of a claim of an unsecured class of claims shall receive or retain on account of such unsecured claim property of a value as of the effective date of the plan equal to the allowed amount of such unsecured claim."[1] (Emphasis added.). A further extension of time was sought in which to file the disclosure statement, to and including October 5, 1981.

At length, after the passage of seven more months without the filing of any disclosure statement or any monthly operating report, the court entered its order on May 21, 1982, setting a hearing for June 14, 1982, on the issue of whether the case should be dismissed for failure to file timely monthly operating statements or a sufficient disclosure statement. The time of the hearing was by later order advanced to June 11, 1982.

Minutes before the convening of the hearing on June 14, 1982, the debtor filed, untimely, some of the reports, purporting to cover the twelve-month span from March 1981 to March 1982. Although counsel represented to the court in the ensuing hear-

---

1. Even though, as noted below in the text of this memorandum, nearly all the unsecured claims are those of the ownership of the debtor and related entities, these provisions are impor-

tant when the deficiencies which may possibly become due and owing to secured creditors may ultimately be classified as unsecured creditors.

ing, however, that he had completely complied with the rule requiring the filing of operating statements, it does not appear that any operating reports were filed for April, May or June of 1982. Nevertheless, the reports which were filed were sufficient to indicate that there was not any net income sufficient to cure arrearages owed to creditors and to maintain current payments or otherwise to pay creditors 100% of their claims, as would have been the case in straight liquidation.

In the meantime, on June 2, 1982, the debtor had filed an application for leave of court to sell property prior to approval or confirmation by the court of any plan of reorganization. According to the terms of this application, the debtor proposed to "sell all real and personal property of the debtor located in Newton County, Arkansas, at the 'Lost Mountain Wilderness Retreat' at public auction." The lien of the First National Bank of Little Rock was to attach to the proceeds of the sale and "the estate (was to) receive free of the lien of the bank only that portion of the property which represents its fair, equitable aliquot portion of the sale proceeds attributable to the unencumbered assets of the estate which are being sold." Further, the First National Bank of Little Rock was to be permitted to "bid at the sale on credit against its secured claim lodged in these case proceedings (and) . . . may bid up to the amount of its claim and accrued interest thereon without requirement of bond or payment to the estate." And it was proposed that the court approve the sale after notice only to the secured creditors, all of whom now favored the sale on these principal terms. But there was no indication that any of the creditors had yet received full disclosure. And nothing was said with any discernible clearness about what would be done about any deficiency owing to the secured creditors and how the miniscule amounts owing to bona fide unsecured creditors would be treated.[2] Under such circumstances, the court advised counsel for the debtor in the course of the hearing of June 11, 1982, that it could approve the sale only in conjunction with confirmation of the plan and after full and adequate disclosure to creditors of what disposition would be made of all the debtors' property. Accordingly, the debtor was granted until June 21, 1981, in which finally to produce a disclosure statement. The additional grant of time was as a matter of grace, not of right.

The disclosure statement then filed—some 15 months after the inception of the proceedings and at least 7 months after it was due under the prior orders of the court—was not a nonpareil of clarity. Whereas the application of June 2, 1982, purported to provide for sale of all the real and personal property of the debtor, the disclosure statement adverted only to sale of the real property. Further, it revealed that the "corporation is not to be liquidated" and that it would therefore retain some property, including "all claims of the debtor (which) shall continue to be the property of the debtor." If this was to mean—as it seems—that accounts receivable were to remain the property of the debtor and not liquidated for the benefit of creditors, it meant a sizeable decrease in the value to be utilized for the benefit of creditors under the plan. For, as demonstrated by the contents of the schedules, the accounts receivable of the debtor constituted virtually the only appreciable asset in addition to the $4,000,000.00 worth of real property. And they were valued in the schedules at $461,808.00. Further, $338,830.16 of these accounts receivable were scheduled as due and owing from a related corporation, Dogpatch, U.S.A., Inc., which has common ownership with the debtor Odom Enterprises, Inc.

In fact, the files and records would indicate that, in multiform respects, the ownership of the debtor may vastly benefit from any approval of the proposals now set before the court by the debtor. Not only will

2. See note 1, supra.

the Dogpatch, U.S.A., Inc., account receivable not be given over to the benefit of creditors, but a transfer of $13,600 to Odom Enterprises' sole stockholder in the year preceding bankruptcy as "a transfer of funds previously loaned to the debtor" will not be questioned; nor will the sole stockholder's claim that he and related entities are bona fide unsecured claimants against the Odom Enterprises estate in a sum exceeding $450,000.00. And this is so even as, according to the disclosure statement now made by the debtor in a belated fashion, all the creditors' claims will be impaired. For, if anything is stated clearly in the debtor's disclosure statement, it is that "all claims are impaired."

To ensure that any consent given by the secured creditors to the proposed sale was an informed consent and that they knew that their claims were impaired and, further, to grant the debtor an opportunity to define the type, measure, and degree of the impairment proposed, the court issued its order on July 16, 1982, directing the debtor and creditors to show cause in writing within 12 days why the court should not abstain from and dismiss these chapter 11 proceedings.

■ The debtor, however, apparently dedicated to a consistent pattern of nondisclosure, elected not to respond to the show cause order, but rather filed a notice of appeal of the show cause order to the district court. The notice of appeal, however, has no effect upon this court's proceeding with a consideration of abstention under section 305 of the Bankruptcy Code. In the first place, a show cause order is an interlocutory order which is not appealable. And, even if it is an appealable order, the mere taking of a notice of appeal does not, without the granting of a stay pursuant to Rule 805 of the Rules of Bankruptcy Procedure, have any effect on the operation of the order appealed from. The debtor has requested no stay pending appeal from this court as required by Rule 805, *supra.*

Curiously, as grounds for reversal on appeal, the debtor complains that the court

should not have limited its factual review to the files and records in the case. Ineffable to the last, however, the debtor states no facts from which it could in any way be said that the history of this case warrants anything but dismissal for continuous and flagrant disobedience of the court's orders and the principles set down in the Bankruptcy Code. And it was the debtor (who now complains that the court is making its determination on a fragmentary and incomplete record) who spurned this court's offer to respond to the show cause order of July 16, 1982, and thereby failed and refused to cite the facts which would require the court to convene an actual hearing or else to decline to abstain from this proceeding.

It is also said by the debtor that it uses "impaired" in the disclosure statement simply as a "term of art" and that "the sole fact that illiquid assets greatly exceed liquidated debts is not a cause for determination that there is no impairment, but rather for a determination of impairment and a demonstration of the viability of the proposed plan and the accuracy of the disclosures." "Impairment" ordinarily means, however, that the rights of the creditor are in some way "altered." See section 1124(1) of the Bankruptcy Code. And, rather than answer the court's inquiry as to precisely what is meant by the debtor's use of the term by simply stating in what manner it is proposed to alter the claims, the debtor has embarked upon the above quoted oblique and scarcely intelligible discourse.

It is noteworthy also that, after learning from the recently filed disclosure statement and from the court's show cause order of July 16, 1982, that their claims were to be impaired, no creditor has responded to the order to object to the proposed abstention or dismissal. Even if some of the creditors objected, the court still could not confirm the plan now placed before it so long as some creditors did not voluntarily and knowingly—after being granted sufficient disclosure—accept the plan. See section 1129(a)(7)(A) of the Bankruptcy Code.

And not only have not all the creditors indicated their assent to the plan—although granted an explicit opportunity to do so by the terms of the show cause order of July 16, 1982, but there is still not sufficient disclosure as to what the intention of the debtor is—to what extent the claims are to be altered and whether the debtor's personal property is to be utilized for the benefit of creditors. The filing of the notice of appeal rather than responding to the court's inquiries is only another in the series of obstacles and delay tactics indulged in by the debtor, the others of which have been detailed at length above.

For a year and a half the court has been almost invincibly longsuffering respecting the repeated refusals of the debtor to comply with its orders and the bankruptcy rules and statutes. And subtle and implicit, but nonetheless obvious, in this repeated defiance of the court's authority and duty is the insinuation that the court has no power to act *sua sponte* so long as the creditors do not request such action and so long as they are content to abide the inaction of the debtor. This is a pernicious doctrine, particularly of potential harm in cases such as that at bar, in which sufficient disclosure is never made, despite the persistent attempts of the court to evoke it. For creditor inaction may be induced by the lack of information or the misinformation which results from the nondisclosure of the debtor's operations and purposes and intentions.

And virtually all the authorities, general and specific, point to the duty of the court to dismiss a case when there is a failure and refusal to prosecute it in accordance with the court's orders and the demands of the Bankruptcy Code. See, e.g., *In re Kang,* 18 B.R. 680, 681 (Bkrtcy.N.D.Ill.1982), to the following effect:

"(A) debtor seeking relief in a bankruptcy court must travel a two-way street. The Code, the Bankruptcy Rules of Procedure and orders of this court impose many general and specific duties upon the debtor. See 11 U.S.C. sections 521,

1106, 1107; See also, Rules of Bankruptcy Procedure, R. 402, R. 11–11, R. 11–30, R. 11–45. Rule 402 provides that the debtor *shall* 'comply with all orders of the court.' Rule 11–30 provides that the debtor *shall* file monthly reports and Local Rule 11–3.03 provides that the debtor *shall* file semi-monthly reports of cash receipts and disbursements, monthly reports of operations and monthly statements of Profit and Loss. When a debtor fails to obey court orders or discharge the duties imposed upon him by the Code or Rules, dismissal of the proceeding is proper."

Elsewhere, it is said that section 1112(b) of the Bankruptcy Code

"gives wide discretion to the court to make an appropriate disposition of the case *sua sponte* or upon motion of a party in interest ... but only for cause (which) ... may include the continuing loss to or diminution (sic) of the estate of an insolvent debtor, the absence of a reasonable likelihood of rehabilitation, the inability to effectuate a plan, unreasonable delay by the debtor that is prejudicial to creditors, failure to file a plan within the appropriate time limits ...."

House Report No. 95–595, 95th Cong., 1st Sess. (1977) 405, U.S.Code Cong. & Admin. News 1978, pp. 5787, 6361.

The general authorities, also, recognize that, if a court must stand by and let the debtor or plaintiff dictate a time schedule to it, the natural result will be chaos. "(I)f for one moment our calendars slip from our direct supervision and control, the result will be chaos." Flanders, Case Management in Federal Courts: Some Controversies and Some Results, 1981 The Justice System Journal, 147, 148. Accordingly, it is deemed within the inherent power of the court to dismiss a case for failure to prosecute in accordance with the orders and rules of the court. "It is well established that the ... court has the authority to dismiss or enter default judgment, depending on which party is at fault, for failure to prosecute with reasonable diligence or to comply

with its orders or rules of procedure . . . the power is one inherent in the courts . . . (and) . . . it may be exercised *sua sponte* under proper circumstances." *Flaksa v. Little River Marine Construction Co., Inc.*, 389 F.2d 885, 887 (5th Cir. 1968).

■ Dismissal is therefore proper and it should be exercised by this court as a matter of unreviewable discretion pursuant to section 305 of the Bankruptcy Code. Abstention, under the literal provisions of section 305, may be undertaken by the court *sua sponte* and its exercise is unreviewable by appeal or otherwise. Conversion would almost certainly result in an appeal which would further delay the rights of creditors even beyond the unconscionable length to which they have now been delayed. Thus, it is obvious that abstention would be in the best interests of the creditors, particularly in view of the above described uncertainty as to the manner in which their claims will be treated in the chapter 11 proceedings, an uncertainty of longstanding which the debtor does not, even now, propose to relieve. And the debtor will benefit from abstention in that it will now be free to pursue whatever bargaining and negotiation it wishes to undertake without the duty to account to the court which it so obviously wishes to avoid.

Abstention is appropriate for another reason also. That is the attitude of defiance which the debtor continues to evince toward the authority of the court. The former indirect and tacit challenges to the court's authority have now been made direct and explicit in the notice of appeal from the court's show cause order. It is now intimated that the debtor will not abide this court's orders unless and until the undersigned spreads his credentials before the debtor's counsel for inspection and approval and, even then, a challenge will issue forth to the jurisdiction and power of the bankruptcy court generally. It is readily apparent that it would be futile under such circumstances to do anything but abstain and dismiss the chapter 11 proceedings with prejudice. Creditors who may disagree with the court's conclusions, of course, have 10 days in which to move the court for reconsideration. *In re Kang, supra*, at 682. It is therefore

ORDERED that this court abstain from these chapter 11 proceedings under the provisions of section 305 of the Bankruptcy Code. It is further, accordingly

ORDERED AND ADJUDGED that, as a matter of unreviewable abstention, these chapter 11 proceedings be, and they are hereby, dismissed with prejudice.